TERRITORY, respondent, *v.* PAUL, appellant.

CRIMINAL LAW — *impeaching witness — cross-examination — extent of informa-*
*tion — jury not judge to decide.* An impeaching witness may be cross-
examined as any other to discover the grounds and extent of his informa-
tion. If such witness shows that he has any information on the subject,
the testimony should be admitted and the jury not the judge determine
what weight to attach to it.

SAME — *larceny — intent.* It is error to charge the jury that simply killing an ox, with another party, knowing the ox was not the property of that other party, but that it belonged to a third party, amounts to larceny, without adding thereto, " with a view of converting it to his own use, or of permanently depriving the owner thereof." The error is not cured, though elsewhere in the charge larceny is correctly defined.

EVIDENCE — *testimony of wife.* The testimony of a wife is not admissible in behalf of a prisoner jointly indicted with her husband where it would tend to influence the case against her husband. The statute does not change the rule of common law.

### Appeal from First District, Jefferson County.

JOHNSTON & TOOLE, and SHOBER & LOWRY, for appellant.

1. The court erred in not allowing appellants the right to impeach the character of McDougal for truth and veracity, and refusing appellants, after Worthington had testified that he was acquainted with that character in the neighborhood where he resided, the question, " is that reputation good or bad," and in passing upon the competency of the witness and rejecting his testimony instead of allowing the jury to pass upon the sufficiency of the same. *Bates* v. *Barber,* 4 Cush. 109.

2. American authorities agree upon the propriety of the following questions to an impeaching witness: First, " Are you acquainted with the general reputation of the witness for truth and veracity, in the neighborhood in which he lives ? " If this is answered affirmatively, then, Second, " Is that reputation good or bad ? " 1 Greenleaf on Evidence, § 461 ; 1 Whart. Crim. Law, § 814. The English authorities and many American allow the further question, " From what you know of the general reputation of the witness would you believe him under oath ? "

3. The court erred in refusing to allow the wife of defendant Paul to testify in behalf of defendant Barnes.

W. F. SANDERS, for respondent.

1. Before a witness can testify to reputation it must appear that witness knows that reputation, and his means of knowledge are matters of examination. Witness testifying to reputation occupies similar position as an expert testifying to matters of skill or science. Precedents to the contrary are devoid of reason and based on no legal principle.

2. The testimony of witness showed his incompetency, and of that the judge and not the jury is to decide.

3. Error in a detached part of a charge is to be disregarded, if the charge, taken as a whole, states the law correctly.

4. This was a joint trial of two defendants, and the wife of neither was a competent witness for the other. 1 Whart. Crim. Law, §§ 767–771, and cases there cited.

KNOWLES, J. The principal assignment of error in this case is the rejection, by the court, of the testimony of Worthington, who was called by the defendants for the purpose of impeaching the witness for the Territory, McDougal.

Counsel for the defense introduced the witness, Worthington, and asked him the following questions:

1. "Are you acquainted with the general reputation of the witness, McDougal, in the neighborhood where he lives, for truth and veracity?" Ans. "I am."

2. "Is that reputation good or bad?"

This question was objected to by the prosecution, and the objection sustained.

3. "From what you know of his general reputation for truth and veracity, in the neighborhood in which he lives, would you believe him under oath?"

This question was objected to by the prosecution, and the court sustained the objection, and the defendants excepted. When the first question was answered, the prosecution claimed the privilege of cross-examining Worthington, for the purpose of showing that he did not have the knowledge sufficient of the general character of McDougal, in the neighborhood where he lived, to entitle him to testify as to his general character for truth and veracity. This was granted, and upon this cross-examination the witness said: "That there were about seventy-five people residing in the vicinity of McDougal who would be competent to testify in any case; that he had never heard but thirteen out of that number even speak of the character of the witness for truth and veracity; that a Mr. Belcher was one of them;" and "that he said, in his own house, in July, 1872, that McDougal was a bad man, a drunkard and a thief." "This was when I had McDougal arrested for robbery."

The court then permitted the prosecution to introduce said Belcher, as a witness to the above conversation with the impeaching witness. This was objected to by the defense. Belcher said: "That he had no recollection of ever having any conversation with the witness, Worthington, relative to the character of McDougal, for truth, and would have remembered it if he ever had."

The court held that Worthington had not shown sufficient knowledge of the reputation of McDougal, for truth and veracity, to entitle him to testify concerning the same.

The general rule in the text-books, that treat upon the impeachment of a witness whose reputation for truth and veracity is in question, is this: The witness must be asked: "Do you know the general reputation of the witness, for truth and veracity, in the neighborhood where he lives?" If the answer be in the affirmative to this question, and not otherwise, then the further question may be asked: "What is that reputation?" The English text-books say it is proper to ask the witness, if he says this reputation is bad: "From what you know of this reputation, would you believe the witness under oath?" Some American authorities sustain the same rule. Although the question does not seem to have been considered much, whether the party, whose witness is sought to be impeached, should have the right to cross-examine the impeaching witness, as to his knowledge of the general reputation of the witness whose character for truth and veracity is questioned, it would seem that the right to cross-examine an impeaching witness should be as completely recognized as the right to cross-examine any other witness. This has been the general practice of the courts in this Territory. Whether, if it should appear from the cross-examination of the impeaching witness that he has no knowledge of the general reputation, for truth and veracity, of a witness that is sought to be impeached, the court should have the power to exclude his evidence, is a question upon which I have seen no authority. Is the fact, as to whether a witness has sufficient knowledge of the general reputation of another witness, for truth and veracity, for the court or jury? If a witness answers that he has no knowledge of the general reputation of another witness, for truth and veracity, it would be wrong to allow him to testify to what that reputation was, and the court

has the power to stop the examination of such a witness. If a witness should show, in cross-examination, that he had no knowledge of the general reputation of a witness sought to be impeached, for truth and veracity, it would seem that the court ought to have the power to say that a man could not be impeached by any such witness. When a witness shows he has some knowledge of a man's character, for truth and veracity, in the neighborhood where he lives, I think the rule should be, that the jury must judge as to the weight to be given to his testimony. To hold in all cases the court should determine, from the testimony of a witness, whether he had sufficient knowledge of a man's general character, for truth and veracity, would make it the arbiter of a question of fact. It was contended that an impeaching witness occupied the position of an expert, as to character for truth and veracity.

There are some analogies between the two classes of witnesses. When an expert is introduced, no one would contend that it was the province of the court to determine whether he had sufficient knowledge of the subject upon which he was called to testify to permit his evidence to go to the jury. If a physician should be called upon to testify to a medical point, it would not be the province of the court to determine whether he had sufficient knowledge of his profession to permit him to testify in regard thereto. The witness may be cross-examined as to his medical knowledge, and the jury must judge of his capacity to testify. If the witness should say that he was not a physician and never practiced that profession, he ought not to be allowed to testify to such a point.

We find the witness, Worthington, did say, "that he was acquainted with the general reputation of the witness, McDougal, for truth and veracity in the neighborhood where he lived, and that he had heard some thirteen persons, neighbors of the said McDougal, speak of his reputation for truth and veracity; that there were some seventy-five persons competent to testify in any case, who lived in the neighborhood of McDougal." The court, having no power to determine whether a man has sufficient knowledge of a witness' general reputation for truth and veracity where he has some, erred in excluding the testimony of Worth-

ington.   The court had no right to say whether a man can receive sufficient information from thirteen men in a witness' neighborhood to his general reputation for truth and veracity.   If thirteen men would not be sufficient to impart such information, how many would?   The testimony of Worthington to his conversation with Belcher does not seem to have been upon McDougal's reputation for truth and veracity.   The introduction of Belcher to contradict Worthington upon this point seems to have had for its object the giving to the court information to enable it to decide whether Worthington did have sufficient information as to the general reputation for truth and veracity of McDougal, to permit him to testify in relation thereto.   This introduction of Belcher shows the position assumed by the court in relation to this matter, that it, and not the jury, should determine whether Worthington had sufficient knowledge of the general reputation of McDougal for truth and veracity in the neighborhood where he lived to allow him to testify in regard thereto.   This was error.

The second exception is to the following part of the judge's charge to the jury: " I further say to you, gentlemen, as a further matter of law for your application to the proof, that if you should find from the proof that although the defendant William Barnes did not, with the defendant Paul, kill the ox in question, but that he did join with A. W. McDougal in so doing, knowing the same was not the property of McDougal, and shall further find that Addison Myers was the owner thereof, then you should find the defendant Barnes guilty, although he may not have then known who was the real owner of the ox in question."   There can be no doubt that, taken by itself, this part of the charge is wrong.   It leaves out of view the *animus furandi*.   To constitute *larceny*, the party committing the offense must have the view of converting the property to his own use permanently, or depriving the owner of his property permanently.   The facts specified in the above charge require, in addition thereto, the felonious intent.   Either Barnes or McDougal, of which Barnes had knowledge, must have intended to make this ox their property, or deprive the owner of the same permanently.   It is true that in other parts of the charge the court sufficiently defines the crime of *larceny*, and specifies the necessary ingredients thereof.   But

nowhere does the court call the attention of the jury to the specific facts set forth in the above charge, and make the necessary additions to constitute the crime of *larceny*.

The rest of the charge, save as to the verdict the jury might bring in, refers to the facts that appear against Paul and Barnes jointly. There was some evidence against Barnes that does not bear with equal force against Paul. While admitting that a charge to a jury should be taken together, and, if it states the law correctly, there is no error, I hold that, as to the facts specified in this part of the charge, the charge taken together does not state the law, and hence, that here was an error committed by the court.

The last point I shall consider is the refusal of the court to admit the testimony of the wife of Paul on behalf of Barnes. A wife, where her husband and another are jointly indicted, cannot testify on behalf of the other party, if her testimony would have a tendency to influence the case against her husband. The statute has not changed this rule. It appears that Paul and Barnes were tried together, and that the testimony of Mrs. Paul would contradict an important point in the evidence of McDougal, and tend to discredit the testimony he had given against her husband, Paul, as well as that against Barnes. I find no error in the exclusion of this evidence on the part of the court.

The judgment is reversed.

*Judgment reversed.*